**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

─────────────────────────────────────

**ROSANNE DIPIZIO**

**and**

**DREAMCO DEVELOPMENT CORPORATION,**

                              **Plaintiffs,**                    **15-CV-901G(Sr)**
**v.**

**EMPIRE STATE DEVELOPMENT**
**CORPORATION,  et al.,**

                              **Defendants.**

─────────────────────────────────────

## REPORT, RECOMMENDATION  AND ORDER

            This case was referred to the undersigned by the Hon. Richard J. Arcara,

in accordance with 28 U.S.C. § 636(b), for all pretrial matters and to hear and report

upon dispositive motions.  Dkt. #60.  The case was subsequently transferred to the

Hon. Frank P. Geraci, Jr.


            Currently before the Court are defendants' motions to dismiss.  Dkt. ##71,

72, 75 & 77.  For the following reasons, it is recommended that the motions be granted.


## BACKGROUND

            Because the plaintiffs have made a number of claims against the

defendants which involve complex procedural and substantive issues, I have

deliberately sacrificed brevity by setting forth in detail the factual history as it relates to these claims in order to provide appropriate context for the recommendations herein.

Plaintiff Rosanne DiPizio is the President and Chief Executive Officer of Plaintiff Dreamco Development Corporation ("Dreamco"), which provides project management and supplies construction materials, including concrete, to non-party DiPizio Construction Company, Inc.  ("DiPizio Construction").  Dkt. #49,[1] ¶¶ 12, 36 & 38.

On November of 2011, defendant Erie Canal Harbor Development Corporation ("ECHDC"), a subsidiary of defendant Empire State Development Corporation ("ESD"), sought bids for construction on the  Erie Canal Inner Harbor Project ("Project").  Dkt. #49, ¶¶ 14 & 41.  In reliance upon "incomplete plans and specifications," DiPizio Construction submitted the lowest of six bids for General Contractor of the Project.  Dkt. #49, ¶ 44.  The Pike Company ("Pike"), submitted the second lowest bid.  Dkt. #49,

¶ 44.

On December 30, 2011, ECHDC's President, defendant Thomas Dee; ECHDC's Construction Manager, defendant The LiRo Group ("LiRo"); ECHDC's Director of Construction, defendant Mark Smith; President of DiPizio Construction, Bernard DiPizio; and plaintiff Rosanne DiPizio, *inter alia*, discussed DiPizio

---

[1] Docket #49 is plaintiffs' amended complaint.

-2-

Construction's bid. Dkt. #49, ¶ 46. The original minutes of that meeting represent that

DiPizio Construction confirmed that excess soil was required to be disposed of in a

registered landfill and that it had no questions, concerns or issues regarding the Health

and Safety Plan ("HASP"), requirements.  Dkt. #49, ¶¶ 47-48.


On January 6, 2012, LiRo sent a letter to Mr. Smith reporting that DiPizio

Construction's low bid appeared to be the result of its lower overhead, ownership of a

concrete batch plant and its "desire to seek an acceptable NYSDEC alternative landfill

location for contaminated soil disposal."  Dkt. #49, ¶ 50.  LiRo advised Mr. Smith that

the bid was viable and should be accepted.  Dkt. #49, ¶ 50.  The letter was not

distributed to the ECHDC Board of Directors.  Dkt. #49, ¶ 52.


Mr. Smith provided Mr. Dee with a copy of  the original December 30,

2011 meeting minutes for distribution to the ECHDC Board of Directors at their meeting

on January 9, 2012.  Dkt. #49, ¶ 54.  Based on LiRo's opinion, Mr. Dee recommended

that the Project be awarded to DiPizio Construction.  Dkt. #49, ¶ 55.  The ECHDC

Board of Directors approved the award of the Construction Agreement to DiPizio

Construction.  Dkt. #49, ¶ 55.


Immediately following the ECHDC Board of Directors vote, Mr. Smith sent

Pike's Chairman an email stating, "sorry I didn't get back to you, and just to let you

know the [B]oard awarded DiPizio the contract this morning, will keep you in mind for

future projects."  Dkt. #49, ¶ 56.

Subsequent to the ECHDC Board of Directors meeting, Rosanne DiPizio received a copy of the December 30, 2011 meeting minutes and issued a correction to note that it understood the soil management plan and would dispose of excess material in accordance with local rules and regulations with NYSDEC approval and that DiPizio Construction understood and would comply with the bid documents for HASP. Dkt. #49, ¶ 47-48.  The corrections were "published and no exceptions were taken." Dkt. #49, ¶ 49.

On January 10, 2012, Mr. Dee publicly stated that the Project would be ready for public access by year-end.  Dkt. #49, ¶ 59.

The Construction Agreement stated that construction was to commence on February 1, 2012.  Dkt. #65, p.7.  However, delivery of the Construction Agreement was delayed by New York State's failure to allocate the necessary funds.  Dkt. #49, ¶ 61.  On March 20, 2012, to avoid having to rebid the Project, ECHDC requested that DiPizio Construction extend its bid bond.  Dkt. #49, ¶ 62.  During a discussion between Mr. Dee, Bernard DiPizio and Rosanne DiPizio regarding the Project's completion date, Mr. Dee stated that "ECHDC would not unreasonably withhold any reasonable request made by [DiPizio Construction]."  Dkt. #49, ¶ 63.  In reliance upon this representation, DiPizio Construction signed the bond extension.  Dkt. #49, ¶ 64.

In an email dated March 25, 2012, Mr. Smith opined that Rosanne DiPizio "doesn't like me mixh [sic] ha ha."  Dkt. #49, ¶ 65.

On April 2, 2012, the NYSDEC granted preliminary approval to DiPizio Construction's proposed method of soil disposal at Great Lakes Industrial's facility in Hamburg, New York and confirmed to DiPizio Construction that upon receipt of analytical data, the soil could be reused through a BUD.  Dkt. #49, ¶ 67.

On April 10, 2012, Rosanne DiPizio submitted a Material Handling Plan ("MHP"), which proposed that the soils be moved to a nearby New York State Thruway Authority property for testing and then taken to the disposal site.  Dkt. #49, ¶ 69.  The MHP included both the New York State Thruway Authority permit and the NYSDEC's approval.  Dkt. #49, ¶ 69.  The ECHDC denied the MHP.  Dkt. #49, ¶ 69.  In addition, Mr. Smith and LiRo contacted the NYSDEC and "induced" it to stop working with DiPizio, which it did.  Dkt. #49, ¶ 70. Plaintiffs allege that Mr. Smith and LiRo "interfered with DiPizio's BUD application in furtherance of the RICO Defendants' unlawful conspiracy to hinder [Rosanne DiPizio's] and [DiPizio Construction's] ability to timely complete the Project and wrongfully blame them for the Projects delays as a pretext for wrongfully terminating [DiPizio Construction]."  Dkt. #49, ¶ 71. Plaintiffs note that ECHDC allowed the contractor for an adjacent project to dispose of the same type of soil in the same facility that it refused to allow DiPizio Construction to use.  Dkt. #49, ¶ 72.

Due to the delay in receiving the Construction Agreement, and to avoid pouring concrete and installing landscaping in the winter months, on March 30, 2012, DiPizio Construction asked ECHDC for an extension of the 300-day completion date. Dkt. #49, ¶ 73.  In light of Mr. Dee's representation that the Project would be ready for

public access by year end, ECHDC was initially unwilling to grant the extension and instead offered to allow DiPizio Construction the opportunity to walk away from the Project without a claim on its bid bond if it would publicly admit that it had made a mistake in its bid and allow the Project to be rebid.  Dkt. #49, ¶ 74.

By e-mail to Mr. Hoyt dated April 14, 2012, Mr. Dee stated that DiPizio Construction is "not a good contractor."  Dkt. #49, ¶ 77.

By e-mail dated April 18, 2012, Mr. Smith provided Mr. Dee with a proposed schedule in the event the Project was re-bid and the two discussed whether they should provide the losing bidders, including Pike, and the Buffalo Building and Construction Trade Council with a "heads up" as to the possibility that the Project might be rebid.  Dkt. #49, ¶ 78.

On April 18, 2012 Mr. Dee sent an e-mail to Mr. Smith, Mr. Hoyt, and other ECHDC staff members and an attorney opining that if DiPizio Construction signed the Construction Agreement, "let the claims begin."  Dkt. #49, ¶ 79.

When asked by Mr. Smith on April 19, 2012 if DiPizio Construction's request for an extension of the substantial completion date because of the delayed project funding was its only complaint, Mr. Dee responded, "[f]or now, of course."  Dkt. #49, ¶ 80.

On April 25, 2012, Mr. Dee sent an email containing talking points in case DiPizio chose not to sign the Construction Agreement to Mr. Smith, Mr. Hoyt and ECHDC's attorney and opined that "we need to make sure [DiPizio Construction] is not allowed to rebid."  Dkt. #49, ¶ 81.  Mr. Hoyt responded:

> If we do not have a signed agreement we need to hope for an amicable parting.  Whether or not they agree to that will determine the tone of our message.  If we can [sic] into a public shit fight with them [sic].  WE LOSE.

Dkt. #49, ¶ 82.  Mr. Dee subsequently sent an email to Mr. Smith asking about "the steps to rebid" and suggesting that ECHDC "make sure" DiPizio Construction "cannot participate."  Dkt. #49, ¶ 83. In another email to Mr. Hoyt, Mr. Smith and ECHDC's attorney, Mr. Dee opined that "[i]t's now obvious that the contractor clearly underestimated the Project."  Dkt. #49, ¶ 85.

The Construction Agreement was signed on April 25, 2012.  Dkt. #49, ¶ 87 & Dkt. #71-5.  Although the Construction Agreement provided for substantial completion of the Project within 300 days of the Notice to Proceed, on April 30, 2012, Mr. Dee signed a 90 day tolling period.  Dkt. #49, ¶¶ 75 & 89 & Dkt. #71-5, p.11.  The Notice to Proceed was issued on May 2, 2012.  Dkt. #49, ¶ 90.  The substantial completion date for the Project, with the extension, was June 6, 2013.  Dkt. #49, ¶ 87.

Upon execution of the Construction Agreement, Dreamco was retained by DiPizio Construction at an hourly rate of $130.00 per hour for Rosanne DiPizio's role as Project Manager.  Dkt. #49, ¶ 88 & Dkt. #79, pp.15-16.

Plaintiffs allege that Mr. Dee and Mr. Smith directed LiRo to deny several of DiPizio Construction's submittals and refused to grant several justified change orders which were authorized by the Construction Agreement. Dkt. #49, ¶ 91.  Mr. Dee and Mr. Smith directed ECHDC to withhold 10% retainage, even though New York State Finance Law Section 139F permits only 5% retainage when construction bonds have been posted, forcing DiPizio Construction to sue ECHDC to obtain release of $453,000 in excess retainage.  Dkt. #49, ¶¶ 92 & 93.  Mr. Smith also directed LiRo to consistently cut the percentage of pay in the monthly pay application submitted by DiPizio Construction.  Dkt. #49, ¶ 94.

Plaintiffs also allege that ECHDC made "numerous design changes - some on the critical path (the necessary sequence of tasks required to complete the Project)."  Dkt. #49, ¶ 96.  For example, ECHDC issued Change Proposal Request ("CPR") 8 to revise the location of Wall A 7 feet and 8 inches to the west.  Dkt. #49, ¶ 96.  The Construction Agreement provides that no time extension shall be granted by reason of the issuance of an change order unless expressly stated in the change order. Dkt. #71-5, p.21.

On July 17, 2012, Mr. Dee sent an email to LiRo stating:

> my observation is that this project is on a path destined for unwarranted delay.  We need a plan.  Can we meet Monday?

Dkt. #49, ¶ 97.

On October 4, 2012, ECHDC issued CPR 24 which affected the critical path by requiring installation of a 1.5 inch thick extruded polystyrene foam board directly under the structural slab.  Dkt. #49, ¶ 98.  Plaintiffs allege that CPR 8 and 24 "alone added eight months to the Project's completion date."  Dkt. #49, ¶ 99.

On October 11, 2012, Mr. Dee sent the following email to Mr. Smith:

> Any fireworks regarding our schedule projections? How did they respond to that reality? Joel [Giambra, former Erie County Executive] is trying to get a meeting with our new Chairman [Robert Gioia].

Dkt. #49, ¶ 100.  Mr. Smith responded that he was aware of Mr. Giambra's meeting request and that he had mentioned to Mr. Hoyt that DiPizio Construction's "management style is top down in order to wear everybody down."  Dkt. #49, ¶ 101.  Mr. Smith further responded that he had met with Mr. Giambra earlier in the day and opined that "Rosanne acts like she always does, very short."  Dkt. #49, ¶ 101.

On October 13, 2012, Mr. Dee advised Mr. Hoyt and Mr. Gioia to decline Mr. Giambra's request for a meeting.  Dkt. #49, ¶ 103.  Mr. Hoyt disagreed, stating his opinion that they should "allow Joel to make his case and then the three of us can talk." Dkt. #49, ¶ 103.  Mr. Gioia replied:

> Agreed! At the end of the day, any delays or whatever are going to fall into our lap.  We know what he is after and I decided to set this up so we can say we are trying to work this out.  Obviously the end runs are not working!

Dkt. #49, ¶ 104.

On October 13, 2012, Mr. Dee allegedly directed ECHDC's landscape architect to reject DiPizio Construction's submittal of granite material that met the contract's specifications and would have saved DiPizio Construction approximately $600,000.00.  Dkt. #49, ¶ 106.

On October 19, 2012, Mr. Dee emailed Mr. Hoyt and Mr. Gioia that "the schedule will be late because the contractor is disorganized and incompetent."  Dkt. #49, ¶ 107.  In a subsequent email, Mr. Dee advised Mr. Hoyt and Mr. Gioia:

> I have zero confidence in Joel or his contractor to expedite this contract.  My repeated mantra for the contractor, they don't know what they don't know.

Dkt. #49, ¶ 108.

On January 14, 2013, Mr. Dee directed ECHDC's attorney to hold a payment of $871,000.00 for work completed six weeks earlier.  Dkt. #49, ¶ 112.

Mr. Hoyt called Mr. Giambra to ask if Ms. Lehman, New York State's Project Manager for the Peace Bridge, could meet with DiPizio Construction.  Dkt. #49, ¶ 113.  Mr. Giambra agreed, at which point Mr. Hoyt and Mr. Gioia approached Ms. Lehman to ask her if she would take a "cursory" look and provide her opinion regarding issues with the Project.  Dkt. #49, ¶¶ 113-114.

At the direction of Mr. Dee and Mr. Smith, a Project Performance Report ("LiRo Report"), dated January 24, 2013 was prepared by LiRo Group without input

from DiPizio Construction.  Dkt. #49, ¶¶ 116-118 & 122.  The LiRo Report identified

numerous examples of DiPizio Construction's non-compliance with the Construction

Agreement, including:

1. The general contractor has failed to issue any recovery construction schedules since June 2012 in order to bring the project in line with the contractual project completion date. The general contractor has contended that any project completion delays have resulted from owner changes and subsurface obstructions that they have encountered during the excavation and pile driving operations.  Based on available information, these contentions appear to be without merit. . . .

2. The contractor has continued to produce construction schedule updates that do not match the current field conditions onsite; are missing construction activities; fail to take into account curing and preparation work; have unrealistic duration expectations and have unrealistic start and finish schedule dates.  The contractor has also failed to produce regular monthly schedule updates.  The contractor updates during progress meetings are general in nature and do not address specific remedies required to mitigate project delays. . . .

3. The contractor has not consistently provided complete coordinated submittals to meet the specification requirements (i.e., multiple product data, test data, samples and qualifications of various critical submittals).  This results in the rejection of the submittals which have delay[ed] the start of certain work. . . .

4. There is an apparent lack of coordination between trades for the pedestrian bridges fabrication/construction. The general contractor has been asked repeatedly for "as-built" drawings of all bridge abutments to be provided to the bridge manufacturer prior to fabrication and to cross-coordinate all electrical installations with the electrical contractor.  No confirmation has been received to date that this information has been provided. . . .

5. Despite the requirements of the contract documents, [DiPizio Construction] challenged the specifications relative to the soil disposal requirements, contending that they should be allowed to dispose of the soil per DEC regulations rather than as specified in the contract at a sanitary or industrial landfill. This caused inefficiencies in the general contractor's excavation activity. . . .

6. The general contractor has failed to submit and mock-up the stonework as specified almost nine months after the start of construction.  This failure will have a negative impact on the construction schedule due to fabrication lead time and create a potential quality control issue. . . .

7. The CM has notified the general contractor that the subbasement egress path stair conditions [are] not in compliance with their Health and Safety Plan [HASP]. . . .

Dkt. #75-3, p.7.  The LiRo Report also identified numerous issues with respect to

Quality Control; Administration/Management and Scheduling.  Dkt. #75-3.  The LiRo

Report made nine recommendations "to be taken in an attempt to mitigate delays in the

completion of the project and to ensure the quality of work," before concluding that

> the failure of the general contractor to fully comply with the contract requirements and to effectively manage the construction activities as discussed herein have resulted in significant project inefficiencies that seriously jeopardize the timely completion of the project.  The lack of coordination and management oversight has adversely impacted the quality of the work and the overall progress of the project.  A review of all documentation produced by the CM team indicates that the issues addressed herein have been previously raised with the general contractor.  Despite this fact, no meaningful corrective action has been taken by the general contractor.

Dkt. #49, ¶ 120 & Dkt. #75-3.  Plaintiffs contend that "the numerous design errors,

design changes, unorthodox handling of and inordinate delays in submittal responses

and change orders . . . were the real cause of the major delays in the Project's

schedule and increased costs."  Dkt. #49, ¶ 124.


On January 24, 2013, Mr. Smith directed Frank Franco, LiRo's Vice

President, to email a copy of the LiRo Report to defendant William J. Brennan, Esq., at

defendant Phillips, Lytle, LLP.  Dkt. #49, ¶ 125.  Mr. Smith subsequently advised Mr.

Franco that Mr. Brennan "had some question" with respect to the report and wanted to discuss it with him.  Dkt. #49, ¶ 125.

On January 25, 2013, Mr. Dee sent an email to Mr. Brennan and Kenneth Manning, Esq., at Phillips Lytle directing them to issue an Interoffice Memorandum ("Phillips Lytle Memo"), and setting forth "specific language and conclusions to be incorporated in their memorandum."  Dkt. #49, ¶ 126.  Without speaking with Mr. Franco, Mr. Brennan issued the Phillips Lytle Memo as Mr. Dee directed and without reference to ECHDC's significant design changes and errors.  Dkt. #49, ¶ 128.  The Phillips Lytle Memo, addressed to Mr. Dee, Mr. Gioia, and Mr. Hoyt, advised:

> it appears highly unlikely that DiPizio Construction . . . will, in fact, meet the substantial Completion Date.  (As of this date, approximately 69% of the 13 months allotted for the Project has expired - yet [DiPizio Construction] has completed 39% of the work.)  This, in turn, would expose [DiPizio Construction to liquidated damages of $5,000.00 per day (viz., $150,000 per month).  That recourse must await Project completion.
>
> [DiPizio Construction] is currently in breach of the Contract in numerous areas, including:
>
> 1.  failure to submit an approved submittal schedule;
>
> 2.  failure to submit an approved quality control plan;
>
> 3.  failure to maintain proper supervision on site;
>
> 4.  failure to submit timely and accurate Schedule Updates;
>
> 5.  failure to maintain schedule; and
>
> 6.  failure to maintain Builders Risk policy.

Dkt. #71-29.  The Phillips Lytle Memo opined as to some potential steps that ECHDC could take now to attempt to have DiPizio Construction comply with the contract, then

concluded:

> We do not understand that any professional on the Project (LiRo, C&S Engineers, Watts Architecture) believes that [DiPizio Construction] is performing capably or that [DiPizio Construction] will meet the Substantial Completion Date. Our opinion is that [DiPizio Construction] is in breach of the Contract.  Moreover, [DiPizio Construction] has proposed numerous substitution items required by the Contract, or suggested shortcuts to the Work, which have been rejected by C&S Engineers - ECHDC's engineers who are the final arbiters under the Contract.  If ECHDC approves any change requested by [DiPizio Construction] that is not approved by C&S Engineers, it runs the risk of shifting professional responsibility and liability for the Project to ECHDC and the taxpayers.
>
> Adopting some (or all) of the measures noted above may prompt [DiPizio Construction] to be more diligent.  We believe that it may also be helpful to tell [DiPizio Construction], yet again, that it is not without a remedy (viz. a post-completion claim) if, in fact, it believes in the merits of its claim.  In this regard, we understand [DiPizio Construction] is not a stranger to submitting claims in connection with its work.

Dkt. #71-29.

Mr. Dee provided both the LiRo Report and the Phillips Lytle Memo to Mr. Hoyt to forward to Ms. Lehman for review.  Dkt. #49, ¶ 131.  Ms. Lehman was also provided a summary of payments and list of contract changes but was not provided with information regarding alleged design errors or design changes.  Dkt. #49, ¶¶ 132 & 136. Despite understanding that such documentation would be necessary to fairly assess the performance of DiPizio Construction and the cause of the delay, Ms. Lehman failed to ask for the CPR, plans, specifications, submittals, the Construction Agreement and Project correspondence.  Dkt. #49, ¶¶ 137-38.  Mr. Dee and Mr. Smith requested that Mr. Hoyt instruct Ms. Lehman not to meet with DiPizio Construction.  Dkt. #49, ¶ 139.

-14-

On January 29, 2013, Ms. Lehman sent an email to Mr. Hoyt opining that

LiRo or its personnel overseeing the Project should be replaced and that DiPizio

Construction should be asked to submit a Project Recovery Plan.  Dkt. #49, ¶ 142.

More specifically, Ms. Lehman advised:

> ECHDC has tons of risk: ECHDC should not have let the
> issues get this far gone before acting, I believe our
> [Construction Manager] is weak, and the Contractor doesn't
> have the requisite experience or staff to get it done.  In a
> perfect world I would replace both CM and Contractor. At a
> minimum you will need to get new CM and Contractor
> leadership and get a good recovery plan in place.  You could
> allow some extras to sweeten the deal with [DiPizio
> Construction] to get them motivated and not losing their
> shirt; while added [sic] bigger liquidated damages on the
> other end.  If you add extras, you could actually amend the
> contract to substantial completion on phases and then have
> liquidated damages that are interim and not only at the end
> of the project.

Dkt. #77-3, p.2.  Ms. Lehman specifically addressed issues regarding excess material

disposal, storage of excavated material, the HASP, and Notice of Changed Conditions,

opining that DiPizio Construction's excuses on these issues were largely without merit.

Dkt. #77-3, pp.2-3.  For example, Ms. Lehman opined that

> Standard construction practice is to excavate and test
> material onsite, because of the potential of hazardous or
> contaminated materials.  In fact taking the untested material
> off site may be a violation of the permits on the project as
> this is not standard practice.  I am sure DEC would be
> interested in this practice as it is likely a violation of State
> environmental law and could subject DiPizio to daily fines.

Dkt. #77-3, p.2.  She also opined that storage of excavated material "is clearly the

Contractor's responsibility and part of the Contractor's base bid;" "[s]ite safety is also

part of the base bid;" and "HASP under the law and under standards of practice can not

have qualifiers."  Dkt. #77-3, p.2.  As to the LiRo Report, Ms. Lehman inquired:

If the issues were as serious as reported, why didn't LiRo, as ECHDC's CM and responsible for oversight of all these issues, take immediate measures to bring the Contractor into compliance?  If we were aware, why didn't ECHDC take corrective action sooner?

* * *

There is a whole host of items under the quality control section that I would have shut down the project as CM, called the permitting or regulatory agency and had [DiPizio Construction] fined so they understand the seriousness of their laxity.  I also would have shut the project down with a schedule submission that has been outstanding for 240 days.

I totally agree with all the schedule substantial peril issues. Bridges and masonry are long lead, especially with a contractor with limited experience in these areas.

Dkt. #77-3, p.3.  As for Corrective Actions, Ms. Lehman advised:

Prior to start of work after winter shutdown, [DiPizio Construction] needs to submit a Project Recovery plan (this is industry standard nomenclature - yet it is not mentioned anywhere by either side which is kind of scary to me) including a full time field superintendent, project specific QA/QC plan, submittals for samples and mock ups, subcontractor approval, a realistic schedule that is updated monthly which includes FTE (full time equivalent staff) commitments, plan for regular coordination meetings for subcontractors, and schedule separate project production and progress meeting from administrative meetings.  Give them a specific amount of time to respond and tell them if they so do satisfactorily, we will open the door to potential extra payment.  If not we will notify the surety and start the process to replace the contractor.

I would also ask for change in LiRo personnel assigned to the project, or use someone else altogether.  The project seems like it was allowed to spin out of control a bit.  A change on our side would signal ECHDC is serious about performance to [DiPizio Construction] and that they are next.

Dkt. #77-3, p.3.  Mr. Hoyt did not share this email with anyone.  Dkt. #49, ¶ 142.

On January 30, 2013, Mr. Hoyt requested that Ms. Lehman send a

second email omitting any criticism of LiRo.  Dkt. #49, ¶ 143.  Ms. Lehman responded

with the following opinion:

> I believe that [ESD] is correct in their assessment that
> [DiPizio Construction] is not performing as expected and
> have real doubts about getting the project finished within a
> reasonable amount of time without excessive extras and an
> inferior final constructed project.  To have the project at 70%
> of the schedule, yet only constructed to 39% of value for the
> easier phase of the project with bridges, masonry work and
> canal in front of us, this is a recipe for failure.
>
> I do believe that [DiPizio Construction] could hire some
> skilled staff and subconsultants and implement an
> aggressive recovery plan.  I would have them provide a plan
> that requires certain deliverables within a given time frame to
> see if they respond and if not I would fire [DiPizio
> Construction].  You can view it as a last chance agreement.

Dkt. #49, ¶ 144 & Dkt. #77-4.

On January 31, 2013, Mr. Hoyt forwarded Ms. Lehman's revised email to

Mr. Dee and Mr. Gioia via email with a statement that Ms. Lehman's opinion "is

consistent with [Mr. Dee's] views and what he has heard from other experts."  Dkt. #49,

¶ 148.  Plaintiffs dispute that Mr. Dee had "heard from other experts."  Dkt. #49, ¶ 149.

On January 31, 2013, Mr. Brennan delivered to counsel for DiPizio

Construction a copy of the LiRo Report along with a directive that DiPizio Construction

designate a construction co-superintendent by February 4, 2013; procure a builders risk

policy of insurance by February 5, 2013; provide a submittal schedule, schedule update

and quality control plan by February 15, 2013; and submit operational plans in a critical

-17-

path method schedule format by February 22, 2013 demonstrating how lost time could be regained.  Dkt. #49, ¶ 152.

In early February of 2013, Mr. Dee and Mr. Hoyt informed Ms. Lehman that DiPizio Construction would be terminated.  Dkt. #49, ¶ 154.

On February 7, 2013, Mr. Brennan forwarded Mr. Franco an email from DiPizio's counsel to which Mr. Franco responded: "Same old story."  Dkt. #49, ¶ 155.

On February 11, 2013, Rosanne DiPizio voluntarily retained Jim Loewke of Loewke Brill Consulting Group to replace herself on the construction site "in an attempt to diffuse the overwhelming animosity focused on her by the Defendants."  Dkt. #49, ¶ 156.

By letter dated February 15, 2013, counsel for DiPizio Construction advised Mr. Brennan that DiPizio Construction had satisfied the demands of January 31, 2013.  Dkt. #49, ¶ 157.

On February 19, 2013, Bernard DiPizio sent a letter to Governor Andrew Cuomo's Secretary, Larry Schwartz, seeking assistance in obtaining payments of more than $4 million that had been withheld by ECHDC.  Dkt. #49, ¶ 158.

On February 20, 2013, Mr. Brennan sent a letter to defendant Travelers Casualty and Surety Company of America ("Travelers"), DiPizio Construction's surety,

enclosing his January 31, 2013 communication to DiPizio Construction and advising

Travelers that DiPizio Construction's response was "insufficient," causing ECHDC to

believe that DiPizio Construction could not complete the Project in a timely and

professional manner.  Dkt. #49, ¶ 159.


On February 22, 2013, Mr. Schwartz forwarded Bernard DiPizio's letter of

February 19, 2013 to Mr. Dee and Mr. Hoyt.  Dkt. #49, ¶ 163.  On February 25, 2013,

Mr. Dee emailed Mr. Hoyt a proposed response which Mr. Hoyt forwarded to Mr.

Schwartz along with a copy of the LiRo Report and Phillips Lytle Memo.  Dkt. #49,

¶ 164.  The response stated that ECHDC had experienced

> nothing but problems with [DiPizio Construction.]  We have
> given them every opportunity to comply with the contract
> requirements, we have been reasonable and they have been
> fighting us all the way.

Dkt. #49, ¶ 165. Mr. Hoyt added: "This company has a reputation for fighting with the

owners of projects and have multiple lawsuits pending on other projects."  Dkt. #49,

¶ 166.  Plaintiffs allege that this statement was false and defamatory.  Dkt. #49, ¶ 166.


On March 6, 2013, Mr. Brennan sent a second letter to Travelers

requesting a meeting and enclosing LiRo's review of the Recovery Schedule submitted

by DiPizio Construction on February 22, 2013.  Dkt. #49, ¶ 172.  LiRo's review noted

"many serious deficiencies" in the Recovery Schedule.  Dkt. #49, ¶ 173.  For example,

LiRo identified "activities that are currently shown with inaccurate 'actual start and finish

dates," "major activities that are currently missing from the recovery schedule" and

"areas where the work sequences and projected completion dates will not work as

currently shown when the previously noted missing activities are incorporated into the

schedule." Dkt. #75-4.  Specifically, LiRo noted that

> Activity #63 Mock-up granite - has continued to push out it's
> start date for no apparent reason, its currently shown as
> 3/18/13.  This activity should have been completed months
> ago based on [DiPizio Construction's] own previous
> schedule updates.  This activity push-out has now caused
> [DiPizio Construction] to be in non-compliance with the
> contract document requirements of having mock-ups
> constructed 90-days in advance of any material installations
> or shipments onsite.  The first granite installation is shown to
> start on 4/15/13, approximately one month after the mock-up
> is completed.  Site handrail activities #111, #112, #113 have
> also been pushed out approximately (1) month since
> schedule update #6.  CPR-33's handrail modifications
> should be incorporated into the next schedule update.
> [DiPizio Construction] needs to provide an explanation on
> why these activities lost time in the current recovery
> schedule.

Dkt. #75-4, p.3.  A meeting with Travelers was scheduled for March 15, 2013.  Dkt. #49,

¶ 175.


On March 12, 2013, Mr. Brennan emailed Mr. Dee, Mr. Smith and ECHDC

counsel  a copy of the performance bond and the termination provision of the

Construction Agreement and suggested that they meet prior to the meeting with

Travelers.  Dkt. #49, ¶ 176.  Mr. Dee agreed that they should discuss the "desired

outcome" for the Travelers meeting.  Dkt. #49, ¶ 176.


On March 13, 2013, Mr. Brennan sent an email to DiPizio Construction's

attorney advising that the only acceptable granite material would be "Virginia Mist" and

the only fabricator that would be approved was the North Carolina Granite Corporation.

Dkt. #65, p.38.

Immediately following the meeting with Travelers on March 15, 2013, Mr.

Dee sent an email to Mr. Hoyt and Mr. Gioia stating:

> Today's meeting brought out a new option, that we'll have
> Travelers provide project management and field supervision
> that will help facilitate many of the current outstanding
> issues.

Dkt. #49, ¶ 180.  Plaintiffs assert that, contrary to Mr. Dee's representation, the

agreement at the meeting was that

> Travelers would monitor the Project, have access to [DiPizio
> Construction's] records and subcontractors and, [sic] attend
> the weekly job meeting.  There was no agreement to have
> Travelers provide project management and field supervision
> nor for Travelers to have any communications with [ECHDC]
> without [DiPizio Construction] personnel present.

Dkt. #49, ¶ 184.  Later that day, Mr. Dee sent an email to Mr. Hoyt describing "lots of

negative body language and grunts" from Rosanne DiPizio.  Dkt. #49, ¶ 182.


Travelers retained Cashin, Spinelli & Ferretti ("Cashin"), as a consultant to

monitor the Project's progress.  Dkt. #49, ¶ 185.  Their employees, Christopher Rose

and Christopher Herron, began attending weekly subcontractor meetings.  Dkt. #49,

¶ 186.  From their first meeting, Mr. Rose and Mr. Herron represented to all present at

the weekly subcontractor meetings that DiPizio Construction would be terminated from

the Project and that Travelers would take over.  Dkt. #49, ¶ 187.


On March 21, 2013, Dan Cirri, an employee of LiRo, contacted the

foreman of one of DiPizio Construction's subcontractors and told him that DiPizio

Construction "was in trouble."  Dkt. #49, ¶ 188.

On April 10, 2013, Mr. Brennan sent an email to Mr. Dee advising that ECHDC could expect a published baseline schedule the following week with a recovery schedule the week after that.  Dkt. #49, ¶ 191.  Mr. Brennan also advised that Rosanne DiPizio "sat through the entire meeting seething and uttered not a word."  Dkt. #49, ¶ 191.  An email from Mr. Franco to Mr. Dee regarding an issue raised at the meeting stated: "Rosanne may be spiteful on this one."  Dkt. #49, ¶ 193.

On April 15, 2013, ECHDC's attorney emailed ESD Senior Vice President of Government Affairs, Kevin Younis, advising that if a letter being sent in response to an inquiry by New York State Senator Ranzenhoffer became public it would allow DiPizio Construction to challenge Mr. Dee's narrative.  Dkt. #49, ¶ 194.  Mr. Younis replied by asking whether there was anything that could be said about LiRo and its role to provide "some cover."  Dkt. #49, ¶ 194.

On April 16, 2013, DiPizio Construction issued a revised baseline schedule.  Dkt. #49, ¶ 195.

During a meeting requested by William Quinn, DiPizio Construction's insurance agent, Mr. Hoyt was advised that the Project's problems were caused by Mr. Smith, to which Mr. Hoyt responded: "it's not just Smith, it's Dee too."  Dkt. #49, ¶ 196.

In an email dated April 30, 2013, Mr. Dee opined that "there is only about 5% truth in whatever [Rosanne DiPizio] says."  Dkt. #49, ¶ 197.

On May 3, 2013, Mr. Dee emailed ESD's Director of Design and Construction, Barbara Lampen, to advise that ECHDC had "reached our limit" and would exercise their right of termination and inquire as to any procedural protocols to "move this forward."  Dkt. #49, ¶ 199.  Ms. Lampen responded that as long as legal counsel had reviewed the termination letter and the Board of Directors was in support, Mr. Dee was "covered."  Dkt. #49, ¶ 200.  She presumed that Mr. Dee was prepared with a press release/statement regarding the termination and that ESD's Director of Public Affairs, Cassie Harvey, had been informed.  Dkt. #49, ¶ 200.  She also suggested that Mr. Dee be prepared for the press with an action plan to demonstrate how ECHDC would recover the work schedule and minimize economic loss. Dkt. #49, ¶ 200.

Mr. Hoyt emailed Ms. Harvey on May 3, 2013 to advise:

> it is likely that we will terminate the contract of this contractor Monday but wanted to check in with you first. Kenneth is aware of the problem and has been supportive of our efforts to date.  That said, we believe it is time to finally sever our relationship with this problem contractor.  I have copied Maria Lehman who works out of the Buffalo office on this message as she has considerable experience with these issue [sic] and this contractor.  There will likely be interest from the media on this as this is a very high profile and popular project.

Dkt. #49, ¶ 201. Despite this characterization by Mr. Hoyt, Ms. Lehman subsequently testified under oath that she had no problems or issues with DiPizio Construction.  Dkt. #49, ¶ 202.

Also on May 3, 2013, Mr. Dee responded to an email from Ms. Harvey

asking if ECHDC had an "action plan,"  by informing Ms. Harvey, Mr. Hoyt and Mr. Gioia

that DiPizio Construction would have 5 days to react to the letter of termination at which

point

> Travelers would take over the construction process.  They
> have been involved for the last several weeks.

Dkt. #49, ¶ 204.  Mr. Dee also advised that

> we need to strategize our message once we gauge the
> contractors [sic] reaction.  They will eventually file a law suit.
> We are well positioned to defend.

Dkt. #49, ¶ 204.


On May 6, 2013, LiRo issued a supplemental report stating that there had

been no improvement in the Project's management and schedule.  Dkt. #49, ¶ 205.  For

example, LiRo reported that

> The [General Contractor] has not made positive
> advancement on the construction of the stone mock-ups and
> has recently noted that all new submittals & samples will be
> provided for the supply and fabrication of the type A granite
> material. A second granite stone substitution was just
> received for Jet Mist 12 months into the project.  The surety
> had previously recommended going with the specified
> Virginia Mist to move the project forward but the [General
> Contractor] later recanted this option based on their
> contention that North Carolina granite could not make the
> schedule.  As of today it's still not clear what the original
> submitted stone fabricators roll [sic] was on the project.  The
> submittal process is still ongoing.  A replacement bridge
> fabricator has been proposed to the A/E team due to the
> [General Contractor's] ongoing financial problems with the
> approved fabricator.  The [General Contractor] has
> contended that the original fabricator is having manpower
> and financial hardships and will not be able to complete the

> fabrication in a timely manner.  The [General Contractor] has
> recommended that all the bridge materials be transferred
> over to the new proposed fabricators shop.  Conclusion - the
> mock-up progress has actually regressed in the last 6
> weeks, and the bridge fabrication process has been at a
> standstill.

Dkt. #75-5, p.3.


On May 7, 2013, Mr. Hoyt emailed ESD's President, Kenneth Adams, to

memorialize their discussions regarding ECHDC's intent to serve DiPizio Construction

with a notice of termination, opining that ECHDC

> had difficulties with the company virtually from the start of
> the project a year ago.  We have given them ample
> opportunity to get it right but they have failed to comply with
> [sic] simplest requests.

Dkt. #49, ¶ 207.  In support of this opinion, Mr. Hoyt attached copies of the LiRo Report

and the Phillips Lytle Memo.  Dkt. #49, ¶ 207. Mr. Hoyt forecast that

> Once DiPizio is terminated, Traveler's insurance, the
> bonding company, will be responsible for completing the
> project.  We anticipate a completion date in approximately
> 10-12 months.

Dkt. #49, ¶ 809.


On May 8, 2013, Mr. Dee provided the ECHDC Board of Directors with

copies of the LiRo Report and the Phillips Lytle Memo and advised that he intended to

terminate DiPizio Construction.  Dkt. #49, ¶ 211.  The Board of Directors did not vote to

authorize Mr. Dee to terminate DiPizio Construction.  Dkt. #49, ¶ 214.

Mr. Dee issued DiPizio Construction a written Notice of Intention to Terminate, effective May 13, 2013.  Dkt. #49, ¶ 215.  Mr. Dee publicly criticized the Project's management and advised the public that the anticipated completion date was Spring of 2014.  Dkt. #49, ¶ 219.

On May 9, 2013, DiPizio Construction submitted a reply to the Notice of Intention to Terminate which refuted each and every alleged cause for the termination. Dkt. #49, ¶ 220.  Specifically, in response to the claim of "Failure to Maintain Project Schedule" and "Failure to Provide an Appropriate Schedule," DiPizio Construction advised that a revised baseline schedule had been issued on April 16, 2013 and approved by ECHDC and that all critical path items on the revised schedule had been maintained with only a few minor, non-critical paths changed.  Dkt. #49, ¶ 221.  DiPizio Construction noted that the primary impact on the schedule was caused by the 39 CPR's issued by ECHDC.  Dkt. #49, ¶ 221.

With respect to the claim of "Failure to Perform the Work in a Good and Workmanlike Manner,"  DiPizio Construction responded that there had been no prior notice of any concerns regarding workmanship.  Dkt. #49, ¶ 223.  Mr. Dee subsequently testified under oath that there were no concerns regarding the quality of work performed.  Dkt. #49, ¶ 223.

With respect to the claim of "Failure to Provide the Materials Needed," and "Failure to Comply with Specifications - Granite/Sandstone," DiPizio Construction

opined that any delay for granite and/or sandstone was due to ECHDC and noted that 90% of the remaining work was subcontractors' work which had either already been approved or was awaiting approval by ECHDC.  Dkt. #49, ¶¶ 224 & 227.

With respect to the claim of "Failure to Timely Prepare and Submit a Submittal Schedule,"  DiPizio advised ECHDC that its submittal schedule had been approved weeks earlier.  Dkt. #49, ¶ 226.

With respect to its claim of "Failure to Comply with Specifications - Bridges,"  DiPizio Construction advised that it had notified ECHDC that the subcontractor had defaulted on fabrication of the bridge despite payment by DiPizio Construction of $225,000.00 cash and $251,000.00 raw materials.  Dkt. #49, ¶ 228. DiPizio Construction further noted that ECHDC approval to substitute LMC to complete the bridges remained pending.  Dkt. #49, ¶ 228.

With respect to its claim of "Failure to Develop and Implement a Quality Assurance and Quality Control Program,"  DiPizio Construction advised that its plan had been accepted several weeks earlier without concerns expressed over poor quality control prior to the Notice of Termination.  Dkt. #49, ¶ 230.

Despite DiPizio Construction's response, Mr. Dee refused to withdraw the Notice of Termination.  Dkt. #49, ¶ 236.

On May 13, 2013, DiPizio Construction commenced a lawsuit against the ECHDC in New York State Supreme Court, Erie County (No. 602666/2013), claiming, *inter alia*, that ECHDC breached the Construction Agreement and seeking an injunction to stop ECHDC from terminating DiPizio Construction's contract.  Dkt. #49, ¶ 236.

On May 23, 2013, Travelers declined to issue new bonds to DiPizio Construction, thereby preventing DiPizio Construction from bidding on new jobs.  Dkt. #49, ¶ 238.

On May 25, 2013, the Buffalo News attributed the Project's delays to DiPizio Construction by quoting language from the Termination Notice and citing the LiRo Report and Phillips Lytle Memo.  Dkt. #49, ¶¶ 241 & 242.

Erie County Supreme Court Justice Timothy Walker conducted hearings on the motion for preliminary injunction during June and July.  Dkt. #49, ¶ 245.  DiPizio Construction produced 12 witnesses, including numerous subcontractors who "uniformly testified that . . . the coordination between DiPizio Construction and the subcontractors was good," LiRo's handling of submittals was unorthodox, and the delays were caused by ECHDC.  Dkt. #49, ¶ ¶ 245 & 246.  Judge Walker denied the motion for preliminary injunction by Order entered July 19, 2013.  Dkt. #49, ¶ 250.

On July 22, 2013, ECHDC terminated DiPizio Construction as the General Contractor for cause and made a claim on the performance bond issued by Travelers.

Dkt. #49, ¶ 251.  DiPizio Construction terminated Dreamco's contract that same day.

Dkt. #49, ¶ 260.

During a conference with Judge Walker's law clerk on August 12, 2013,
the law clerk represented that Judge Walker felt that ECHDC "was jamming DiPizio."
Dkt. #49, ¶ 270.  Mr. Brennan replied that Travelers had told ECHDC "words to the
effect that the paperwork was a mess and that the subcontractors didn't know what to
build."  Dkt. #49, ¶ 271.

On August 23, 2013, DiPizio Construction requested a package for the
rebidding of the Project, but was denied.  DKt. #49, ¶ 273.

On September 13, 2013, DiPizio Construction filed a lawsuit in New York
State Supreme Court, Erie County (Index No. 801815/2013), against the New York
State Urban Development Corporation d/b/a ESD; ECHDC; Sam Hoyt; Thomas Dee
and Mark Smith seeking damages for defamation and injurious falsehood of DiPizio and
their tortious interference with the Construction Agreement.  Dkt. #49, ¶ 274 & Dkt. #71-
13. DiPizio Construction alleged that, "due to personal animus and motive and in an
attempt to shift blame from Defendants' own incompetence, [Defendants] conspired to
wrongfully deprive [DiPizio Construction] of its good standing and reputation in the
community . . . ."  Dkt. #71-13, ¶ 32.  DiPizio Construction alleged that it was made "the
scapegoat for a Project delayed by funding, poor and deficient engineering, poor
design, and poor contract administration."  Dkt. #71-13, ¶ 44.  DiPizio Construction also

complained of numerous change orders and unresolved design issues.  Dkt. #71-13, ¶ 61.

On September 13, 2013, DiPizio Construction filed another lawsuit in New York State Supreme Court, Erie County (Index No. 02612/2013), against ECHDC alleging that the termination of the Construction Agreement was a nullity because the Board of Directors failed to vote to terminate the Construction Agreement.  Dkt. #71-14.

On September 16, 2013, DiPizio Construction commenced a lawsuit in New York State Supreme Court, Erie County (Index No. 801829/2013), against LiRo, alleging that LiRo administered the Construction Agreement in bad faith and failed to comply with its contractual obligations, causing undue delay and adding expense to the Project.  Dkt. #71-16.  DiPizio Construction specifically complained that LiRo rejected submittals that should have been approved, denied change orders without cause and refused justified requests for extension of the Project completion date.  Dkt. #71-16.

On September 23, 2013, Travelers and ECHDC entered into a Takeover Agreement in which Travelers agreed to complete the Project with a substantial completion date of May 1, 2014.  Dkt. #49, ¶ 275 & Dkt. #71-6.  The Takeover Agreement provided that Travelers "shall be responsible for the completion of the Remaining Work" and "shall perform the Remaining Work through one or more Competing Contractors . . . which it shall engage."  Dkt. #71-6, p.4. Pike Construction was appointed to complete the Project.  Dkt. #49, ¶ 286.

On September 25, 2013, Mr. Brennan falsely represented to Judge Walker's law clerk that Travelers had accepted ECHDC's claim without reservation of rights.  Dkt. #49, ¶ 276.

On October 17, 2013, Judge Walker informed counsel that Mr. "Dee wanted to put a sword through [Rosanne DiPizio's] heart, not her father's, hers."  Dkt. #49, ¶ 279.

On November 1, 2013, Judge Walker granted DiPizio's motion for partial summary judgment in Index No, 602666/2013, determining that ECHDC wrongfully refused DiPizio's request to dispose of contaminated soils in a different type of landfill than provided in the Project specifications and that ECHDC wrongfully refused DiPizio's request to substitute granite.  Dkt. #49, ¶ 280 & Dkt. #71-9.  Judge Walker also granted DiPizio Construction's motion to enjoin Travelers from compromising DiPizio Construction's claims against ECHDC.  Dkt. #71-11.

On November 6, 2013, DiPizio Construction filed a lawsuit  in New York State Supreme Court, Erie County (Index No. 803777/2013), against ECHDC seeking declaratory judgment that the performance bond had not been triggered. Dkt. #49, ¶ 290 & Dkt. #71-15.

By Order entered April 3, 2104, Judge Walker granted ECHDC's motion for summary judgment and dismissed Index No. 02612/2013 on the ground that the

Board of Directors had ratified Mr. Dee's decision to terminate the Construction

Agreement.  Dkt. #71-19.

During mediation with ECHDC, Travelers and DiPizio Construction on May

6, 2014, Travelers declared that DiPizio Construction had been entitled to a 250 day

extension of time due to ECHDC's design errors and design changes, especially CPR 8

and CPR 24.  Dkt. #49, ¶ 295.

On July 16, 2014, Travelers commenced an action in this court against

DiPizio Constriction and its indemnitors (including Rosanne DiPizio), seeking payment

on multiple performance bonds and asserting a general claim for reimbursement of

expenses on all bonds issued, including Bond No. 105594405 pertaining to the Project.

*Travelers Cas. and Surety Co. of Am. v. DiPizio Constr. Co.*, No. 14-CV-576.

On August 8, 2014, the New York State Supreme Court, Appellate

Division, Fourth Department, reversed Judge Walker and granted summary judgment in

favor of ECHDC regarding the disposal of contaminated soils and the substitution of

granite.  *DiPizio Constr. Co. v. Erie Canal Harbor Dev. Corp.*, 120 A.D.3d 905 (4th Dep't

2014).  Specifically, Presiding Justice Scudder, Justice Centra, Justice Carni and

Justice Lindley determined that:

> [DiPizio Construction] failed to meet its burden on the motion
> and that [ECHDC] met its burden on the cross motion by
> establishing that its construction of the Contract is the only
> construction that can fairly be made. The "Contract
> Documents" included, *inter alia*, the Contract, the project

manuals and addenda, the information to bidders and the special conditions. The provisions concerning the MHP are found in Project Manual Section 312003 Part 3.1, which deals with the identifying information that was to be included in the MHP. Pursuant to Part 3.1(A) (7), the information contained in the MHP was to include identification of the primary and backup facilities for disposal of nonhazardous contaminated soil. That provision of the Contract states that "[t]he primary and backup facilities may be a recycling/ treatment facility or a [DEC] approved lined landfill or other facility approved by [DEC] to accept this material" (emphasis added). Part 3.2 specifies the manner in which contaminated soil stockpiles and excavated materials are to be removed from the site. Part 3.2 (E) provides that "[a]t a minimum, if soil testing indicates the excavation material is not hazardous, based on the known contaminants present[,] these wastes *must* be disposed of at a sanitary or industrial landfill permitted to receive such wastes" (emphasis added).

[DiPizio Construction] sought to dispose of the nonhazardous contaminated soil at a DEC approved facility that was not a sanitary or industrial landfill. [DiPizio Construction] contended that, inasmuch as Part 3.1(A) (7) permits the use of such a facility, [ECHDC's] refusal to approve of that disposal plan constitutes a breach of the Contract. The Contract, however, also incorporated the terms of all of the information sent to bidders, including responses to requests for information (RFIs) that were sent to bidders before [DiPizio Construction] executed the Contract. In one such response, [ECHDC's] project manager specifically stated that "[f]or excess material requiring removal from site[,] . . . 'these wastes must be disposed of at a sanitary or industrial landfill permitted to receive such wastes' " (emphasis added). Moreover, in response to two different RFIs made by [DiPizio Construction] before [DiPizio Construction] executed the Contract, [ECHDC's] project manager clearly and unambiguously stated that any plan to use DEC approved facilities in lieu of landfills was in violation of Section 312003 Part 3.2 (E) and was "not consistent with the project requirements."

To the extent that [DiPizio Construction] and the court relied upon an internal letter between [ECHDC's] project manager and [ECHDC] recognizing that the reason for [DiPizio Construction's] low bid was its desire to seek an acceptable DEC alternative to the landfill, we conclude that the

document was not part of the Contract Documents and is thus extrinsic evidence that we may not consider where, as here, the Contract is not ambiguous (*see South Rd. Assoc., LLC v International Bus. Machs. Corp.*, 4 NY3d 272, 278 [2005]). It is well settled that " 'extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face'" (*id.*).

Although Section 312003 Part 3.1(A) (7) at first glance seems to permit use of a DEC approved facility in lieu of a landfill, upon closer inspection it is clear that the section concerns only the identification information that must be included in the MHP. The section concerning the actual disposal of nonhazardous contaminated soil and the responses to the RFIs, as incorporated into the Contract, contain specific mandatory provisions requiring that such material be disposed of at a sanitary or industrial landfill. " '[W]here two seemingly conflicting contract provisions reasonably can be reconciled, a court is required to do so and to give both effect'" (*Burgdorf v Kasper*, 83 AD3d 1553, 1555 [2011]). Moreover, "it is a well-established principle of contract interpretation that specific provisions concerning an issue are controlling over general provisions" (*Huen N.Y., Inc. v Board of Educ. Clinton Cent. School Dist.*, 67 AD3d 1337, 1338 [2009]; *see generally Muzak Corp. v Hotel Taft Corp.*, 1 NY2d 42, 46 [1956]). Relying on those fundamental rules of contract interpretation, we conclude that the Contract clearly and unambiguously requires nonhazardous contaminated soil to be disposed of at a sanitary or industrial landfill.

Inasmuch as [ECHDC] "establish[ed] that its construction of the [Contract] is the only construction [that] can fairly be placed thereon" (*Nancy Rose Stormer, P.C.*, 66 AD3d at 1450 [internal quotation marks omitted]), [ECHDC] is entitled to partial summary judgment dismissing the fourth cause of action.

With respect to the sixth cause of action, concerning [DiPizio Construction's] attempt to substitute Chester Gray granite for Virginia Mist granite, we again conclude that [DiPizio Construction] failed to meet its burden on the motion and that [ECHDC], in support of its cross motion, established its entitlement to partial summary judgment dismissing that cause of action. Project Manual Section 044310 Part 2.2

discusses the Contract requirements for granite. Part 2.2(A) states that the material must comply with "ASTM C 615," and Part 2.2 (B) lists the material specifications to which all granite must conform. Part 2.2 (D), however, provides that "Type A Granite *shall* be Virginia Mist granite . . . *or approved equal* . . . [and] Type B Granite shall be Cambrian Black granite . . . or approved equal" (emphasis added). Project Manual Section 016000 Part 2.1(A) (6) further provides that, "[f]or products specified by name and accompanied by the term . . . 'or approved equal,'" the proposed substitute product must comply with the "'Comparable Products' Article to obtain approval for use." A Comparable Product is defined in Section 016000 Part 1.3(A) (3) as a "[p]roduct that is demonstrated and approved through submittal process to have the indicated qualities related to type, function, dimension, in-service performance, physical properties, appearance, and other characteristics that equal or exceed those of [the] specified product" (emphasis added). Section 8(D) of the Special Conditions, which are part of the Contract Documents, clearly states that "[t]he Architect's/Engineer's decision on substitutions and/or equivalencies shall be final and is not subject to dispute by" [DiPizio Construction].

[DiPizio Construction] contends that the "approved equal" requirement in Section 044310 Part 2.2(D) applies only to approval of the aesthetic properties of the granite because, otherwise, the material specification requirements of Part 2.2(A) and (B) would be rendered superfluous. [ECHDC] contends that the material requirements of Section 044310 Part 2.2(A) and (B) are merely the minimum requirements for any granite to be used on the Project and apply to both Type A and Type B granite. According to [ECHDC], Part 2.2(A) and (B) are not rendered superfluous by the "approved equal" requirements of Part 2.2 (D) inasmuch as the material specification requirements of Part 2.2(A) and (B) apply to other types of granite used on the site. [ECHDC] thus contends that the "approved equal" requirements for Type A granite apply to all of the qualities of the named granite, including the physical properties.

There is no dispute that Chester Gray granite complies with the material requirements outlined in Part 2.2(A) and (B) and that the architect ultimately approved the aesthetic properties of the Chester Gray granite. There is also no dispute that [ECHDC's] architect determined that the

physical properties of Chester Gray granite were inferior to
that of Virginia Mist granite and rejected the substitution on
that ground.

In our view, the Contract clearly and unambiguously requires
that the proposed substitute for Virginia Mist granite must
have the indicated qualities related to, *inter alia*, physical
properties "that equal or exceed those of" Virginia Mist
granite. [ECHDC] established that the physical properties of
Chester Gray granite did not equal or exceed those of
Virginia Mist granite and, therefore, [ECHDC] had the
discretion to deny approval of the proposed substitution.
Inasmuch as the decision of [ECHDC's] architect with
respect to substitutions is final, we conclude that [ECHDC] is
entitled to partial summary judgment dismissing that cause
of action.

*Id.* at 906-09.  The Appellate Division also reversed Judge Walker's injunction.  *DiPizio*

*Constr. Co. v. Erie Canal Harbor Dev. Corp.*, 120 A.D.3d 909 (4th Dep't 2014).


On August 20, 2014, Travelers intervened in the state court actions

identified as Index No. 602666/2013 and Index No. 803777/2013, asserting that

ECHDC wrongfully terminated DiPizio Construction because DiPizio Construction was

entitled to time extensions for completion of the Project.  Dkt. #49, ¶ 306.


During his deposition on September 19, 2014, Mr. Hoyt testified that

DiPizio Construction was terminated "due to" Rosanne DiPizio, whom he characterized

as "combative and contentious" and, according to Mr. Dee's representation to Mr. Hoyt,

prone to "profanity laced tirad[e]s."  Dkt. #49, ¶ 308.


In November of 2014, DiPizio Construction placed Dreamco on notice that

because DiPizio Construction's termination was "due to" Rosanne DiPizio, it would hold

Dreamco responsible for any damages or losses it suffered pursuant to a hold harmless agreement previously entered into between the parties.  Dkt. #49, ¶ 310.

By Decision and Order entered April 24, 2015, Judge Walker determined that DiPizio Construction had defaulted on the General Agreement of Indemnity and that all remaining claims in the contract, defamation and declaratory judgment actions had been assigned to Travelers, who is the real party in interest for purposes of all claims in the state court actions, *to wit*, 602666/2013 (contract action); 803777/2013 (declaratory judgment action); and 801815/2013 (defamation action).  Dkt. #49, ¶ 318 & Dkt. #71-22.  That decision is on appeal to the Appellate Division, Fourth Department.  Dkt. #49, ¶ 319.

Plaintiffs filed this action on July 9, 2015.  Dkt. #1.  The amended complaint asserts eight causes of action: (1) violation of 18 U.S.C. § 1962(c) against ESD, ECHDC, Thomas Dee, Mark Smith, Sam Hoyt, Maria Lehman, The LiRo Group, Phillips, Lytle, LLP and William Brennan, Esq. ("RICO defendants"); (2) violation of 18 U.S.C. § 1962(d) against the RICO defendants; (3) violation of 42 U.S.C. § 1983, specifically, violation of plaintiffs' due process and equal protection rights against the RICO defendants; (4) fraud against the RICO defendants and Travelers ("all defendants"); (5) tortious interference with business relations against all defendants; (6) prima facie tort against all defendants; (7) intentional infliction of emotional distress against all defendants; and (8) violation of New York Judiciary Law § 487 against Phillips, Lyle, LLP and Mr. Brennan.  Dkt. #49.

-37-

DiPizio Construction advised Dreamco that as of July 31, 2015, it has suffered direct losses totaling $15,175,572.00, plus interest, due to its termination.  Dkt. #49, ¶ 321. DiPizio Construction has not retained Dreamco for any additional projects. Dkt. #49, ¶ 322.

On December 23, 2015, the Appellate Division vacated the award of summary judgment and reinstated DiPizio Construction's complaint regarding the lack of a Board vote to terminate the Construction agreement (Index No. 02612/2013), holding that DiPizio Construction had raised a triable issue of fact, in support of its motion for leave to renew, as to whether the Board of Directors had full knowledge of the material facts relating to DiPizio Construction's termination when they ratified Mr. Dee's actions.  *DiPizio Constr. Co., Inc. v. Erie Canal Harbor Dev. Corp.*, 134 A.D.3d 1418 (4th Dep't 2015).  The Appellate Division further determined that there were triable issues of fact as to whether the President of the Board could terminate the Construction Agreement without formal action by the Board. *Id.*

On February 8, 2016, the ECHDC Board of Directors ratified the actions of the President relating to the termination of the Construction Agreement.  Dkt. #95, pp.4-7 & Dkt. #95, pp.20-21.

By Order entered April 7, 2016, Judge Walker denied DiPizio Construction's motion for recusal, noting that he had ruled in DiPizio Construction's favor on several occasions, only to be overruled by the Appellate Division, and advising

that it had "proceeded fairly and impartially since the inception of [these actions], and

shall continue to do so."  *DiPizio Constr. Co., Inc. v. Erie Canal Harbor Dev. Corp*., 51

M.3d 1209 (Sup. Ct. Erie Cty 2016).


## DISCUSSION AND ANALYSIS

**Dismissal Standard**

To survive a motion to dismiss pursuant to Rule 12(b)(6) of the Federal

Rules of Civil Procedure, "a complaint must contain sufficient factual matter, accepted

as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009), *quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Iqbal*, 556 U.S. at 678.  Application of this standard is "a context-specific task

that requires the reviewing court to draw on its judicial experience and common sense."

*Id.* at 679.


**Evidentiary Standard**

"In adjudicating a Rule 12(b)(6) motion, a district court must confine its

consideration "to facts stated on the face of the complaint or incorporated in the

complaint by reference, and to matters of which judicial notice may be taken."  *Leonard*

*F. v. Israel Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999); *see also Kramer v.*

*Time Warner, Inc.*, 937 F.2d 767, 773 (2d Cir. 1991). "Where a plaintiff has relied on

the terms and effect of a document in drafting the complaint and that document is thus

integral to the complaint," the district court may consider the contents of the document

"even if it is not formally incorporated by reference." *Broder v. Cablevision Sys. Corp.*,

418 F.3d 187, 196 (2d Cir. 2005) (internal quotations omitted), *quoting Chambers v.*

*Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).  "If the documents referenced in

the complaint contradict the facts alleged by the plaintiff, the documents control and the

court need not accept as true the plaintiff's allegations." *Olin Corp. v. E.I. Dupont De*

*Nemours and Corp.*, No. 05-CV-100S(Sc), 2006 WL 839415, at *1 (W.D.N.Y. March 27,

2006).


A district court may take judicial notice of judicial opinions and documents

filed in other courts to establish the fact of such litigation and related filings. *Kramer*,

937 F.2d at 774; *See Anderson v. Rochester-Genesee Reg'l Transp. Auth.*, 337 F.3d

201, 205, n.4 (2d Cir. 2003) (taking judicial notice of district court opinion filed

subsequent to appeal in underlying matter); *New York ex rel. Spitzer  v. Operation*

*Rescue Nat'l*, 273 F.3d 184, 199 (2d Cir. 2001) (taking judicial notice of district court's

decision in related proceeding); *17 Vista Assocs. v. City of N.Y.*, No. 95 CIV 3870, 1996

WL 197762, at *3 (S.D.N.Y. 1996) ("state court opinions may properly be considered

pursuant to Rule 201), *aff'd* 104 F.3d 356 (2d Cir. 1996).


**Plaintiffs' 18 U.S.C. § 1962(c) Claims**

RICO's provision for civil actions provides that "[a]ny person injured in his

business or property by reason of a violation of section 1962 of this chapter may sue

therefor in any appropriate United States district court and shall recover threefold the

damages he sustains and the cost of the suit, including a reasonable attorney's fee.  18

U.S.C. § 1964(c).  A plaintiff claiming a civil RICO violation must allege: (1) a violation

of section 1962; (2) injury to business or property; and (3) causation of the injury by the

violation.  *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23 (2d Cir. 1990).

        18 U.S.C. § 1962(c) makes it "unlawful for any person employed by or

associated with any enterprise engaged in, or the activities of which affect, interstate or

foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such

enterprise's affairs through a pattern of racketeering activity."  Thus, to establish a claim

for a civil violation of section 1962(c), plaintiffs must plausibly allege that they were

injured by defendants' (1) conduct; (2) of an enterprise; (3) through a pattern; (4) of

racketeering activity. *Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.,* 187 F.3d

229, 242 (2d Cir. 1999).  These elements must be alleged as to each individual

defendant.  *DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir.), *cert. denied*, 534 U.S. 891

(2001).

        Plaintiffs' first cause of action alleges that the RICO defendants used wire

and mail communications to violate 18 U.S.C. § 1962(c), by engaging

> in a wide-ranging scheme or artifice to wrongfully disparage
> [Rosanne DiPizio] and non-party [DiPizio Construction] and
> mislead various courts of law and the greater public
> concerning the [Project's] delays by manufacturing evidence
> including the LiRo Report, Phillips Lytle Memorandum and
> Maria Lehman's "expert" opinion, which they held out as
> independent and neutral when they decidedly were not and
> submitting this manufactured evidence to other state

> officials, the Court and public in general.  The ultimate
> objective of the RICO Defendants' scheme or artifice to
> defraud was to wrongfully blame [Rosanne DiPizio] and
> [non-party DiPizio Construction] for the [Project's] delays as
> a means for wrongfully terminating [non-party DiPizio
> Construction] and replacing it with [The Pike Company].

Dkt. #49, ¶ 331.  Plaintiffs allege that they have been damaged as a result of DiPizio

Construction's cancellation of its contract with Dreamco and Travelers refusal to issue

additional bonds to DiPizio Construction and that Rosanne DiPizio's reputation has

been damaged by the RICO defendants' allegations against her and by DiPizio

Construction's claim that Rosanne DiPizio and Dreamco caused DiPizio Construction's

damages.  Dkt. #49, ¶ 338.


Conduct

Maria Lehman argues that she did not conduct or participate in the

operation or management of the alleged RICO enterprise.  Dkt. #77-5, pp.4-12.  More

specifically, she argues that plaintiffs fail to allege that she did anything more than

render advice or provide professional services to the alleged enterprise, which is

insufficient.  Dkt. #77-5, p.6.


Plaintiffs respond that Ms. Lehman "was a knowing and willful participant

in the enterprise's unlawful activities" because she

> was an experienced engineer who knew that she was not
> provided with the necessary documentation to perform a
> proper assessment of the Project's progress or plaintiff's
> performance and did not question Hoyt's direction not to
> communicate with plaintiffs even though she knew that
> defendants had already decided to terminate the
> Construction Agreement. . . . Nor did Lehman question

>Hoyt's instruction to remove any reference to LiRo from her
>January 29 e-mail . . .

Dkt. #82, p.5.  Plaintiffs argue that Ms. Lehman's "liability is predicated upon her

knowledge that the opinion she provided was inaccurate, based on both limited

information and redacted opinions that materially affected her conclusion, which she

knew would be used by defendants to terminate the Construction Agreement."  Dkt.

#82, p.6.


In *Reves v. Ernst & Young*, the United States Supreme Court determined

that "to conduct or participate, directly or indirectly, in the conduct of such enterprise's

affairs," as set forth in 18 U.S.C. § 1962(c), "one must participate in the operation or

management of the enterprise itself" and play "some part in directing the enterprise's

affairs."  507 U.S. 170, 179 & 186 (1993).  In that case, the defendant prepared audit

reports valuing a gasohol plant based on the Co-op's investment in the plant, rather

than its substantially lower fair market value.  *Id.*  The Supreme Court found the

defendant's failure to advise the Co-op's board of directors that use of the alternative

fair market value of the gasohol plant would reveal that the Co-op was insolvent was

insufficient to establish that defendant participated in the operation or management of

the Co-op as required to impose liability under § 1962(c).  *Id.*


Subsequently, numerous courts have recognized the distinction between

providing professional services which are essential to the ongoing operations of an

enterprise and participating in the operation or management of the enterprise itself.

*Department of Econ. Dev. v. Arthur Anderson & Co.*, 924 F. Supp. 449, 466 (S.D.N.Y. 1996) (collecting cases). "Indeed, it is well established that the provision of professional services by outsiders, such as accountants, to a racketeering enterprise is insufficient to satisfy the participation requirement of RICO, since participation requires some part in directing the affairs of the enterprise itself." *Hayden v. Paul, Weiss*, 955 F. Supp. 248, 254 (S.D.N.Y. 1997) (collecting cases). Even at the pleading stage, "it is insufficient to merely allege that a defendant provided services that were helpful to an enterprise, without alleging facts that, if proved, would demonstrate some degree of control over the enterprise." *Elsevier, Inc. v. Memon*, 97 F. Supp.3d 21, 33 (E.D.N.Y. 2015). This is true even where the services provided go beyond that which is customary or are so deficient as to constitute professional misconduct. *See Hayden*, 955 F. Supp. at 255 (collecting cases).

Plaintiffs have failed to allege sufficient facts of Ms. Lehman's participation in the operation or management of the alleged enterprise. Even assuming the truth of plaintiffs' allegations that Ms. Lehman's report was biased and based upon insufficient and/or inaccurate information and that Ms. Lehman was aware that the enterprise intended to and actually used her report to injure plaintiffs, that is insufficient to demonstrate Ms. Lehman's participation in the operation or management of the enterprise itself. Accordingly, it is recommended that Ms. Lehman's motion to dismiss be granted for failure to plausibly allege participation in the operation or management of the enterprise.

Enterprise

The RICO defendants[2] argue that plaintiffs have failed to allege facts regarding the  structure of the alleged enterprise and fail to acknowledge that the RICO defendants lacked authority to accomplish the alleged purpose of the enterprise, *to wit*, to replace DiPizio Construction with Pike.  Dkt. #71-1, pp. 28-30.  Defendants also argue that the allegations regarding the enterprise are the exact same allegations of racketeering activity.  Dkt. # 71-1, p.28 & Dkt. #75-7, p.26.

Plaintiffs respond that they "have provided solid information from which this court can fairly conclude that the individual defendants worked together as a unit to achieve their common purpose."  Dkt. #79, p.26.  They reiterate "the common purpose of defendants' conduct was: (I) to falsely blame DiPizio for the Project's delays as a pretext for terminating the C[onstruction] A[greement] and (ii) have Travelers assume responsibility for the Project and then appoint Pike as the completion contractor."  Dkt. #79, pp.26-27. Plaintiffs argue that "[d]efendants' lack of authority to appoint Pike has no bearing on whether an enterprise existed.  Dkt. #79, p.27.  Instead, plaintiffs argue that the court must consider "defendants' unified intent and course of conduct to achieve their common goals."  Dkt. #79, p.27. Plaintiffs define the enterprise as "an association-in-fact consisting of five individuals, two public benefit corporations, an engineering firm and private law firm."  Dkt. #79, pp.36-37.  Plaintiffs allege that "[t]he enterprise's activities consisted of creating multiple fraudulent documents and then

---

[2] Ms. Lehman joins in the arguments of the RICO co-defendants.  Dkt. #77-5, pp.4 & 10.

coordinating their dissemination to various public officials, the media and general public and in the case of the LiRo Report, the courts as well."  Dkt. #79, p.37.

Defendants reply that plaintiffs' allegations are insufficient to constitute an enterprise and reiterate that the allegations regarding the enterprise are coextensive with the allegations of racketeering.  Dkt. #85, p.8 & Dkt. #87, p.9.

An enterprise is defined to include any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.  18 U.S.C. § 1961(4).  As explained by the United States Supreme Court, a RICO enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct," the existence of which is proven "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit."  *United States v. Turkette*, 452 U.S. 576, 583 (1981).  For an association of individuals to constitute an enterprise, the individuals must share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes." *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 174 (2d Cir. 2004).  "In addition to individuals associated in fact, any legal entity may qualify as a RICO enterprise."  *First Capital*, 385 F.3d at 173.

Although the RICO enterprise element must be proven separately from the pattern of racketeering activity, there will often be overlap between the proof offered

to show the existence of each of these elements.  *Breslin Realty Dev. Corp. v. Schackner*, 397 F. Supp.2d 390, 400 (E.D.N.Y. 2005).  However, the enterprise must have some existence beyond the commission of the individual racketeering violations alone. *City of N.Y. v. Chavez*, 944 F. Supp.2d 260, 270 (S.D.N.Y. 2013).  In other words, "the existence of an enterprise is an element distinct from the pattern of racketeering activity and 'proof of one does not necessarily establish the other.'" *Boyle v. U.S.*, 556 U.S. 938, 947 (2009), *quoting Turkette*, 452 U.S. at 583.  Moreover, the existence of an enterprise is distinct from the person conducting the affairs of the enterprise. *See Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001) ("liability depends on showing that the defendants conducted or participated in the conduct of the *enterprise's* affairs, not just their *own* affairs.") (internal quotation omitted); *Kalimantano GmbH v. Motion in Time, Inc.*, 939 F. Supp.2d 392, 405 (S.D.N.Y. 2013) ("In other words, the defendant and the enterprise must be distinct.").

In the instant case, plaintiffs fail to allege any facts that suggest that the alleged enterprise was distinct from the alleged pattern of racketeering activity.  While the complaint alleges improper actions taken by the RICO defendants, there are no allegations to plausibly allege that the RICO defendants engaged in such activity on behalf of an entity with its own structure, identity or hierarchy rather than the entities with whom they worked in order to advance their own interests. *See Singh v. Parnes*, 199 F. Supp.2d 152, 163 (S.D.N.Y. 2002) (motion to dismiss granted where plaintiff failed to allege that the defendants "were carrying out the affairs of an unlawful enterprise rather than their own affairs or those of their institutional employers.").

-47-

Accordingly, it is recommended that the motion to dismiss be granted for failure to allege sufficient facts to establish an enterprise separate and distinct from the alleged pattern of racketeering activity.

<u>Pattern of Racketeering Activity - Continuity</u>

The RICO defendants argue that plaintiffs fail to allege the type of pattern defendants allegedly engaged in and that the facts alleged fail to plausibly suggest either a closed-ended or open-ended pattern of racketeering activity.  Dkt. 71-1, pp.30-33 & Dkt. #75-7, pp.23-25.  More specifically, defendants argue that the duration is less than required for a closed-ended pattern.  Dkt. #71-1, pp.30-31 & Dkt. #75-7, p.23.  In addition, defendants argue that plaintiffs only allege a single scheme.  Dkt. #71-1, pp. 31-32 & Dkt. #75-7, p.23.  Defendants also argue that plaintiffs have failed to allege a threat of continuing criminal activity beyond the termination of the Construction Agreement.  Dkt. #71-1, p.32.

Plaintiffs respond that they have alleged both closed-ended and open-ended patterns of racketeering activity.  Dkt. #79, p.29.  Specifically, plaintiffs respond that "where, as here, the acts of the defendant or the enterprise were inherently unlawful and in pursuit of inherently unlawful goals it is well established that the requisite threat of continuity is adequately established by the nature of the activity, even though the period spanned by the racketeering acts was short."  Dkt. #79, p.31. Moreover, plaintiffs respond that "the nature of defendants' enterprise and the elements of continuity alleged - the number, duration, dimensions, degree, complexity, gravity or

-48-

nature of the RICO predicate acts weighed as a whole - define a pattern of racketeering

activity sufficiently serious not only to produce injury to the plaintiffs, but also to cause

public harm or pose threats to larger societal interests of the type and magnitude

Congress contemplated in enacting RICO."  Dkt. #79, p.36.  For example, plaintiffs note

that, in addition to plaintiffs' injuries, the taxpayers of the State of New York have been

harmed by the delay in completion of this public project, the added cost to completing

the Project and the cost of litigation relating to this Project.  Dkt. #79, p.35.


Defendants reply that there are no allegations of inherently unlawful

activities, but merely a dispute regarding a single construction project.  Dkt. #85, p.9.


In addition to alleging related predicate acts, a plaintiff seeking to

establish a pattern of racketeering activity must also allege that the predicate acts either

amount to, or pose a threat of, continuing criminal activity.  *Cofacredit*, 187 F.3d at 242;

*H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 241 (1989).  This continuity

requirement can be alleged either by allegations of a "closed-ended" pattern – a series

of related predicate acts extending over a substantial period of time – or an "open-

ended" pattern of racketeering activity that poses a threat of continuing criminal conduct

beyond the period during which the predicate acts were performed.  *Spool v. World*

*Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008).  As explained by the

United States Supreme Court:

> "Continuity is both a closed- and open-ended concept,
> referring either to a closed period of repeated conduct, or to
> past conduct that by its nature projects into the future with a

> threat of repetition. . . . A party alleging a RICO violation may
> demonstrate continuity over a closed period by proving a
> series of related predicates extending over a substantial
> period of time.  Predicate acts extending over a few weeks
> or months and  threatening no future criminal conduct do not
> satisfy this requirement: Congress was concerned in RICO
> with long-term criminal conduct.  Often a RICO action will be
> brought before continuity can be established in this way.  In
> such cases, liability depends on whether the *threat* of
> continuity is demonstrated.

*H.J.*, 492 U.S. at 241-42 (emphasis in original).


### Closed-Ended Continuity

To satisfy closed-ended continuity, a plaintiff must prove a series of

related predicates extending over a substantial period of time.  *Spool,* 520 F.3d at 184;

*Cofacredit*, 187 F.3d at 242.  The relevant period is the time during which RICO

predicate activity occurred, not the time during which the underlying scheme operated

or the underlying dispute took place.  *Id.*  In addition to the temporal concept, other

factors to be considered include the number and variety of acts, the number of

participants, the number of victims, and the presence of separate schemes.  *Id.*  While

there is no "bright-line," the Court of Appeals has determined that conduct persisting for

less than two years will only rarely constitute closed-ended continuity.  *Id.*  Moreover,

"courts in this Circuit have held repeatedly that allegations of RICO violations involving

solely mail and wire fraud . . . , a limited number of participants or victims, a discrete

scheme with a narrow purpose or a single property . . . are generally insufficient to

demonstrate closed-ended continuity."  *Kalimantano*, 939 F. Supp.2d at 413.

In the instant case, plaintiffs' allegations of predicate acts between January 24, 2013 (LiRo Report), and May 8, 2013 (Notice of Intention to Terminate), is insufficient to satisfy closed-ended continuity. Even if the duration of the alleged scheme could be considered, the 19 months between January 9, 2012 - the date when DiPizio Construction was awarded the Construction Agreement - and July 22, 2013 - the date that ECHDC terminated DiPizio Construction as the General Contractor - still fails to meet the duration required for closed-ended continuity. Plaintiffs' allegation of a single scheme to deflect blame for delays to a single construction project and wrongfully terminate DiPizio Construction from the Project so as to allow Pike the opportunity to complete the Project are insufficient to override the temporal requirement for closed-ended continuity.

*Open-Ended Continuity*

Open-ended continuity can exist even if the predicate acts did not encompass an extended period of time. *Elsevier Inc. v. Memon*, 97 F. Supp.3d 21, 31 (E.D.N.Y. 2015). To plead open-ended continuity, a plaintiff must assert facts demonstrating that there is a threat of continuing criminal activity beyond the period during which the predicate acts were performed. *Spool,* 520 F.3d at 185; *Cofacredit*, 187 F.3d at 243. If the enterprise is engaged in inherently unlawful acts, there is a threat of continuing criminal activity and open ended continuity exists. *Id.*; *Cofacredit*, 187 F.3d at 243. For example, "where the acts of a defendant or enterprise were inherently unlawful, such as murder or obstruction of justice, and were in pursuit of inherently unlawful goals, such as narcotics trafficking or embezzlement, courts have

generally held that the nature of the activity itself established the threat of continuity

even though the racketeering acts occurred over a short time period." *Kalimantano,*

939 F. Supp.3d at 407.  Fraud is not considered inherently unlawful activity for

purposes of RICO continuity. *Westchester v. Astorino*, 137 F. Supp.3d 586, 611

(S.D.N.Y. 2015); *See Gross v. Waywell*, 628 F. Supp.2d 475, 493 (S.D.N.Y. 2009)

("Unlike the other criminal offenses the statute enumerates as racketeering, use of the

mail or wires is not inherently criminal.").


Where the enterprise is engaged in a legitimate business, an allegation of

open ended continuity requires evidence supporting an inference that the predicate acts

are the regular way of doing business, or that the nature of the predicate acts

themselves implies a threat of continuing criminal activity. *Spool,* 520F.3d at 185;

*Cofacredit*, 187 F.3d at 243; *See Kalimantano*, 939 F. Supp.2d at 407 ("where the

alleged racketeering activity was in connection with businesses or endeavors that are

not inherently unlawful, such as fraudulent acts in connection with the sale of property,

courts generally have not found a threat of continuing criminal activity arising from the

nature of the conduct alone, even if it extended over even longer periods.").


A scheme that "has an intended and foreseeable endpoint" and is,

therefore, "inherently terminable" does not imply a threat of ongoing racketeering

activity so as to constitute open-ended continuity. *Westchester,* 137 F. Supp.3d at 611

(scheme to rig outcome of county political party primary election alleged nothing more

than a single scheme that terminated with the 2013 primary election); *Cofacredit*, 187

F.3d at 244 (scheme to obtain cost-free inventory did not imply threat of ongoing racketeering activity where scheme terminated upon exhaustion of insurance policy limits for unpaid invoices); *GICC Capital Corp. v. Technology Fin. Grp., Inc.*, 67 F.3d 463 (2d Cir. 1995) (scheme to defraud plaintiff by looting defendant's assets before plaintiff could collect on promissory note did not imply threat of ongoing racketeering activity where scheme terminated once assets were looted), *cert. denied*, 518 U.S. 1996; *Ozbakir v. Scotti*, 764 F. Supp.2d 556, 571 (W.D.N.Y. 2011)(scheme effectively over once property was sold to plaintiff at inflated price).

In the instant case, the defendants are all engaged in legitimate businesses and there is no plausible suggestion that the defendants commonly associate with each other so as to engage in mail and wire fraud or that there is any threat that the alleged criminal conduct would continue beyond this discrete construction project.   Accordingly, it is recommended that plaintiffs' complaint be dismissed for failure to plausibly allege either a closed-ended or open-ended pattern of racketeering activity.

**Plaintiffs' 18 U.S.C. § 1962(d) Claim**

Plaintiffs' second cause of action alleges that the RICO defendants violated 18 U.S.C. § 1962(d) by engaging in a conspiracy to conduct the affairs of the enterprise through a pattern of racketeering activity to blame Rosanne DiPizio and DiPizio Construction for the Project's delays.  Dkt. #49, ¶¶ 345-347.

Defendants argue that this claim must be dismissed because the complaint fails to sufficiently allege an underlying RICO violation.  Dkt. #71-1, pp.32-33 & Dkt. #75-7, p.27.  In addition, defendants argue that plaintiffs fail to allege facts suggesting an agreement to sabotage plaintiffs.  Dkt. #71-1, p.33.

Plaintiffs reply that they have sufficiently alleged substantive RICO violations under 1962(c), thereby supporting a RICO conspiracy claim under 1962(d). Dkt. #79, p.37.

To establish a violation of 18 U.S.C. § 1962(d), a plaintiff must show that the defendant agreed with at least one other entity to commit a substantive RICO offense.  *Cofacredit*, 187 F.3d at 244.  "Because the core of a RICO civil conspiracy is an agreement to commit predicate acts, a RICO civil conspiracy complaint, at the very least, must allege specifically such an agreement."  *Hecht*, 897 F.2d at 25.  Absent a substantive violation of RICO, there can be no conspiracy to commit such a violation. *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 182 (2d Cir. 2004).

Plaintiffs' amended complaint does not allege any agreement among the RICO defendants to execute the alleged scheme to defraud. In any event, as set forth above, plaintiffs have failed to plead a RICO cause of action.  Accordingly, it is recommended that the RICO conspiracy claim be dismissed.

**Plaintiffs' 42 U.S.C. § 1983 Claim**

        Plaintiffs' third cause of action against the RICO defendants alleges deprivation of equal protection and due process pursuant to  the 5th and 14th amendments to the United States Constitution.  Dkt. #49, ¶ 353.  Specifically, Rosanne DiPizio alleges that her rights to equal protection were infringed because she is a woman who was treated differently from other similarly situated contractors and intentionally discriminated against because of her gender and that she was deprived of a protected liberty interest without due process of law when defendants publicly and privately defamed her by making statements that they knew to be false.  Dkt. #49, ¶¶ 354-355.

        42 U.S.C. § 1983 "permits an individual deprived of a federal right by a person acting under color of state law to seek compensation in federal court." *Wimmer v. Suffolk Cty. Police Dep't*, 176 F.3d 125, 136 (2d Cir.), *cert. denied*, 528 U.S. 964 (1999).  To prevail on a claim pursuant to § 1983, "plaintiff must prove that the challenged conduct was attributable at least in part to a person acting under color of state law, and that the conduct deprived the plaintiff of a right, privilege or immunity secured by the Constitution or laws of the United States." *Id.* at 137.

<u>Equal Protection</u>

        Defendants argue that Rosanne DiPizio's alleged injuries were indirectly caused by the termination of DiPizio Construction's contract rather than any direct injury to plaintiff.  Dkt. #71-1, p.36.  LiRo also argues that Rosanne DiPizio has failed to

plausibly allege that any state actor intentionally discriminated against her based upon her race, national origin, or gender and that her claim for damages are too attenuated to state a claim against the defendants.  Dkt. #75-7, p.31.

Rosanne DiPizio responds that she has sufficiently alleged deprivation of her personal rights as a result of defendants' deliberate acts against her and that LiRo's argument is without merit.  Dkt. #79, p.38 & Dkt. #81, p.9.

The Equal Protection Clause confers a federal constitutional right to be free from gender discrimination.  *Davis v. Passman*, 442 U.S. 228 (1979); *See Seale v. Madison Cty*, 929 F. Supp.2d 51, 71 (N.D.N.Y. 2013) ( "A plaintiff may allege a claim for the violation of her right to equal protection under the Fourteenth Amendment based on sex discrimination, since the Equal Protection Clause is essentially a direction that all persons similarly situated should be treated alike.")(internal quotation omitted).

"[F]or a § 1983 discrimination claim to survive a motion . . . to dismiss, a plaintiff must plausibly allege a claim under the same standards applicable to a Title VII claim – and that the adverse action was taken by someone acting 'under color of state law.'"  *Vega v. Hempstead Union Free Sch. Dist.,* 801 F.3d 72, 88 (2d Cir. 2015); *See Spear v. Town of West Hartford*, 954 F.2d 63, 68 (2d Cir.) ("Section 1983 addresses only those injuries caused by state actors or those acting under color of state law."), *cert. denied*, 506 U.S. 819 (1992); *See also American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) ("Like the state-action requirement of the Fourteenth

Amendment, the under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful.").

"Once action under color of state law is established, the analysis for such claims is similar to that used for employment discrimination claims brought under Title VII, the difference being that a § 1983 claim, unlike a Title VII claim, can be brought against individuals." *Seale, 929 F. Supp.2d at 71, quoting Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006). "[T]o defeat a motion to dismiss . . . in a Title VII discrimination case, a plaintiff must plausibly allege that (1) the employer took adverse action against him, and (2) his race, color, religion, sex, or national origin was a motivating factor in the employment decision." *Vega v. Hempstead Union Free Sch. Dist.,* 801 F.3d 72, 87 (2d Cir. 2015).

In the instant case, Rosanne DiPizio is the President of a private corporation which contracted with a private corporation which contracted with a state agency. The adverse action of which she complains, *to wit*, the termination of Dreamco's contract for performance of project management duties by Rosanne DiPizio, was taken by DiPizio Construction, which is not alleged to be a state actor. Moreover, Rosanne DiPizio has failed to plead any facts supporting her allegation that she was treated differently from other similarly situated contractors because of her gender. Accordingly, it is recommended that the equal protection claim be dismissed.

Due Process

Defendants argue that Rosanne DiPizio has failed to allege that the allegedly defamatory statements deprived her of a constitutionally protected liberty or property interest. Dkt. #71-1, p.37.  More specifically, defendants argue that Rosanne DiPizio has not suffered any termination or alteration of any status or right conferred upon her by a state entity.  Dkt. #71-1, p.39.  Defendants note that the termination of Dreamco's contract was not imposed by a state actor, but by DiPizio Construction. Dkt. #75-7, pp.30-31.

Rosanne DiPizio responds that she has sufficiently alleged that defendants' defamatory statements have interfered with her future job prospects.  Dkt. #79, p.39.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law . . . "  U.S. CONST. amend. XIV.  "A person's interest in his or her good reputation alone, apart from a more tangible interest, is not a liberty or property interest sufficient to invoke the procedural protections of the Due Process Clause or create a cause of action under § 1983."  *Patterson v. City of Utica*, 370 F.3d 322, 330 (2d Cir. 2004).  In other words, "[d]efamation, by itself, is a tort actionable under the laws of most States, but not a constitutional deprivation."  *Siegert v. Gilley*, 500 U.S. 226, 233 (1991).  Thus, to proceed with a claim of deprivation of a liberty interest in one's reputation without due process of law, *i.e.*, a stigma-plus claim, a

plaintiff must allege the utterance of a statement sufficiently derogatory to injure plaintiff's reputation, that is capable of being proven false and that plaintiff claims is false, plus a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights. *Vega v. Lantz*, 596 F.3d 77, 81 (2d Cir. 2010).

This 'stigma-plus' test requires that the defamation be accompanied by an injury directly caused by the Government, rather than an injury caused by the act of some third party." *Izzo v. City of Syracuse*, 98-CV-778, 2000 WL 1222014, at *7 (N.D.N.Y. Aug. 3, 2000), *aff'd* 11 Fed.Appx. 31 (2001). In other words, "[s]tate action must accompany both prongs of the "'stigma-plus' test." *Id.; See Malapanis v. Regan*, 340 F.Supp.2d 184, 193 (D. Ct. 2004) ("Government imposition of a 'tangible burden' on future employment prospects may satisfy the 'plus' requirement), *aff'd* 147 Fed. Appx. 219 (2d Cir. 2005).

A negative impact on "job prospects, or, for that matter, romantic aspirations, friendships, self-esteem, or any other typical consequence of a bad reputation," is insufficient for purposes of the plus. *Valmonte*, 18 F.3d at 1001; *See Neu v. Corcoran*, 869 F.2d 662, 667 (2d Cir.) ("defamation, even if it leads to a significant loss of employment opportunities, is not a deprivation of a liberty interest unless it occurs in the course of dismissal or refusal to rehire the individual as a government employee or during termination or alteration of some other legal right or status."), *cert denied*, 493 U.S. 816 (1989).

In contrast, stigmatizing statements made in the course of termination of government employment are sufficient to establish the plus requirement.  *See Siegert*, 500 U.S. at 233, *citing Paul v. Davis*, 424 U.S. 693, 708-09 (1976) ("the Court has never held that the mere defamation of an individual . . . was sufficient to invoke the guarantees of procedural due process absent an accompanying loss of government employment.").  Moreover, the Court of Appeals for the Second Circuit has expanded its understanding of the plus requirement  to encompass "termination or alteration of some other legal right or status" as well.  *Velez*, 401 F.3d at 88, *quoting Neu,* 869 F.2d at 667.  For example, placement of an individual on a government registry of child abusers, where potential employers are required not only to consult, but to justify in writing to the state a decision to hire an individual who appears on the registry, satisfies the plus requirement because the refusal of employment is based on more than an individual's damaged reputation, but on the added burden an offer of employment would place on employers.  *Valmonte*, 18 F.3d at 1001-02.  Similarly, in *DiBlasio v. Novello*, the parties conceded that suspension of plaintiff's medical license satisfied the plus requirement. 344 F.3d 292, 295 (2d Cir. 2003), *cert. denied*, 541 U.S. 988 (2004).

In the instant case, Rosanne DiPizio has failed to plausibly allege a material state imposed burden or state imposed alteration of her status or rights.  She was not employed by a state agency.  She had no contractual relationship with a state agency.  Dreamco's contract with DiPizio Construction was not terminated by a state agency.  There are no allegations that the state circumscribed Dreamco's ability to bid on future contracts or otherwise prevented Rosanne DiPizio from offering her services

as a project manager.  In sum, there is no allegation of any substantive legal burden imposed upon Rosanne DiPizio by any state agency.  Accordingly, it is recommended that this aspect of defendants' motion to dismiss be granted for failure to plausibly allege a material state-imposed burden or state-imposed alteration of Rosanne DiPizio's status or rights as required for a stigma plus claim pursuant to 42 U.S.C. § 1983.

**Plaintiffs' State Law Tort Claims**

In accordance with 28 U.S.C. § 1367(c), it is recommended that the Court decline to exercise supplemental jurisdiction over plaintiffs' state law claims.  *See Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well.").

**Leave to Amend**

Although plaintiffs have not sought leave to amend the complaint a second time, defendants have taken the position that dismissal of the complaint should be with prejudice.  Dkt. #85, p.15.   Where a plaintiff has failed to move for leave to replead in opposition to a motion to dismiss, the Court is within its discretion to dismiss a case without granting, *sua sponte*, leave to replead.  *Trautenberg*, 351 Fed. Appx. 472, 474 (2d Cir. 2009).  Dismissal with prejudice is particularly appropriate where, as here, plaintiffs' complaint has previously been amended and there is no indication of additional facts that might lead to a viable complaint. *Horoshko v. Citibank, N.A.*, 373 F.3d 248, 249 (2d Cir. 2004)

**CONCLUSION**

For the foregoing reasons, it is recommended that the defendants' motions to dismiss (Dkt. ## 71, 72, 75 & 77), the amended complaint be granted with prejudice.

Therefore, it is hereby ORDERED pursuant to 28 U.S.C. § 636(b)(1) that:

This Report, Recommendation and Order be filed with the Clerk of the Court.

ANY OBJECTIONS to this Report, Recommendation and Order must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Civ.P. 72(b) and Local Rule 72(b).

The district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance.  *See, e.g., Patterson-Leitch Co. v. Massachusetts Mun. Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988).

Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.  *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." Failure to comply with the provisions of Rule 72(b) may result in the District Judge's refusal to consider the objection.

The Clerk is hereby directed to send a copy of this Report, Recommendation and Order to the attorneys for the parties.

**SO ORDERED.**

**DATED:      Buffalo, New York**
**May  9, 2017**

*s/ H. Kenneth Schroeder, Jr.*
**H. KENNETH SCHROEDER, JR.**
**United States Magistrate Judge**